**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

        **Plaintiff,**

**v.**                                                    **Case 2:08-cr-20429-STA**

TOMMIE DUNN and KODY EVANS,

        **Defendants.**

## REPORT AND RECOMMENDATION ON DEFENDANT TOMMIE DUNN'S MOTION TO SUPPRESS AND DEFENDANT KODY EVANS' MOTION TO SUPPRESS

Before the Court are Defendant Tommie Dunn's Motion to Suppress (Docket Entry "D.E."

#144) and Defendant Kody Evans' Motion to Suppress[1] (D.E. #159). The instant motions were

referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation.

(D.E. #146, #166). The Magistrate Judge held a joint hearing on the motions on January 5, 2012.

For the reasons set forth herein, the Court RECOMMENDS that the instant motions be DENIED.

---

[1] In addition to Evans' Motion to Suppress filed by his counsel, Evans has submitted two *pro se* filings—an "Amended Defendants' Motion to Suppress" (D.E. #168) and a letter stating that he has noticed "mistakes and corrections" in his attorney's Motion to Suppress and would like the Court to allow his counsel to re-file a new motion that is "corrected" and to his "satisfaction." (D.E. #169). It is well-settled that a litigant who is represented by counsel has no constitutional right to demand that the Court also consider *pro se* arguments, pleadings, or motions. See United States v. Edwards, 101 F.3d 17, 19 (2d Cir. 1996); Ennis v. LeFevre, 560 F.2d 1072, 1075 (2d Cir. 1977). The statute governing the manner in which parties may appear in federal court is specifically phrased in the disjunctive: "the parties may plead and conduct their own cases personally or by counsel." See 28 U.S.C. § 1654. If a defendant is not satisfied with his court-appointed counsel, he has a right to represent himself, including if he and his attorney are conflicted on questions of strategy. United States v. Jones, 489 F.3d 243, 248-49 (6th Cir. 2007). If a defendant prefers to represent himself, he must clearly and unequivocally assert this right. Id. Accordingly, as Evans has not clearly and unequivocally asserted his right to represent himself, and on the contrary has made requests of his counsel in the latter filing, the Court recommends that Evans' *pro se* filings be stricken.

1

## I.  Proposed Findings of Fact

Between October 20, 2008 and November 9, 2008, six motel robberies and one attempted motel robbery were committed in Memphis, Tennessee.  (January 5, 2012 Transcript, "Tr." at 12, 14-18).  Each of these robberies had a similar pattern, which began with a female entering the motel, asking a few questions of the desk clerk while presumably "scout[ing]" the premises for customers, cameras, and guards, and then exiting the hotel.  (Tr. at 13).  A few minutes later, two males would "enter the business with pistols drawn demanding money from the clerk."  (Tr. at 13).  The "hostile takeover" approach involved running up to the desk, displaying an "old school revolver," jumping over the counter on at least one occasion, and getting very close to the clerk "in order to get the money" and "make sure no alarms were set off."  (Tr. at 13, 88).  The men would demand not only money from the motel but also personal possessions, such as victims' wallets.  (Tr. at 14-15).  Once the assailants obtained the money, they would run out of the back door and flee the scene in either a red Chrysler Sebring or a silver Chevrolet Malibu, both of which had Arkansas license plates.  (Tr. at 13).

Investigator Forrest Bartlett of the Shelby County Sheriff's Office, who is a member of the Federal Bureau of Investigation's Safe Streets Task Force, was assigned to investigate the motel robberies.  Based upon the victim's descriptions, Bartlett believed that four individuals—three men and one woman—were involved in the robberies.  (Tr. at 72- 87-88).  Because there were no "leads on the scene" as to whom was perpetrating these robberies, officers obtained footage from surveillance cameras at the motels and provided it to local news stations to broadcast with a request for information from the public.  (Tr. at 18).

Following the news broadcasts, on November 11, 2008, a complainant contacted the

Memphis Police Department Crime Stoppers to advise that three individuals had admitted to the complainant that they had committed the motel robberies. (Tr. at 19 & Exhibit 2). The complainant identified these individuals as Tommie Dunn, Jr. ("Dunn"), LaShawnese Evans Jones ("Jones"), and a man with the nickname "Lil Pete." (Tr. at 19, 54-55 & Exhibit 2). The complainant further identified that the vehicles utilized in the robberies were a silver Chevrolet Malibu and a red Chrysler Sebring. (Tr. at 19-20 & Exhibit 2). The complainant stated that one of the individuals, "Lil Pete," was known to stay in West Memphis, Arkansas, which suggested an initial connection to the state where the two suspected vehicles were licensed. (Exhibit 2).

Following the November 11, 2008 tip, Investigator Bartlett began searching law enforcement databases for information regarding these three individuals. (Tr. at 20, 73). He discovered that Jones had previously received a traffic citation in a red Chrysler Sebring. (Tr. at 20, 73). His research also indicated that Dunn and Jones were "somehow connected" or "knew each other." (Tr. at 20-21, 77). Based upon the information received in the November 11, 2008 tip, Investigator Bartlett prepared a photographic display including Jones and Dunn. (Tr. at 21 & Exhibits 3, 4, 8, 9). On November 12, 2008, Investigator Bartlett took these displays to LaShonne Straughter ("Straughter"), the victim of the Studio 6 motel robbery. (Tr. at 21, 73). Straughter made a positive identification of Jones as the female involved. (Tr. at 21, 48 & Exhibit 4). Straughter additionally made a positive identification of Dunn and wrote that he was "the guy that robbed me" and that "he had a gun." (Tr. at 21, 26, 29, 48 & Exhibit 9).

Also on November 12, 2008, a second complainant called the Memphis Police Department Crime Stoppers stating that Jones, who was his wife's daughter, admitted to him that she, her boyfriend with the last name "Dunn," and the father of her sister's child, Albert Nelson ("Nelson"),

were responsible for the hotel robberies. (Tr. at 24-25 & Exhibit 5). The complainant stated that he saw Jones' photograph on the news, that he confronted her, and that she admitted to their participation. (Tr. at 24-25 & Exhibit 5). The complainant provided that Jones resided at the French Village Apartments at 4250 Summer, Apartment 4. (Tr. at 24-25 & Exhibit 5).

Investigator Bartlett proceeded to search law enforcement databases for a second time based upon the information in the November 12, 2008 tip. (Tr. at 26). For the first time, Investigator Bartlett came across the name of an individual, Kody Evans, who "fit the general description of the other subject that was identified in some of the robberies" and "had connections to the other people involved in the case." (Tr. at 26, 76-79).

"Based upon the detail of the information received" in the November 12, 2008 complaint, which came from one of the suspect's relatives, Investigator Bartlett believed he had "very precise information" as to the identity of at least three of the four suspected individuals as well as Jones' current residence. (Tr. at 31, 59). As such, Investigator Bartlett and other officers of the Safe Streets Task Force proceeded to the French Village Apartments to make themselves "aware of where it was, the surroundings and to see if anybody was home." (Tr. at 31). They stated that they primarily sought to "familiarize" themselves with "the area where the apartment was located" before they sought a warrant. (Tr. at 32).

When Investigator Bartlett and Sergeant Joseph Poindexter arrived at the French Village Apartments, they immediately observed "a female and male getting into a silver Chevrolet Malibu with Arkansas tags." (Tr. at 31, 33-34, 59, 91). Investigator Bartlett noticed that the male's appearance was similar to the suspects' descriptions. (Tr. at 34). They also saw a red, older model Chrysler Sebring in the parking lot with a damaged mirror that matched the photographs taken at

one of the robberies. (Tr. at 33-34, 59). Officers approached the two individuals, who identified themselves as Lakendria Thompson ("Thompson") and Nelson. (Tr. at 34, 91). While initially questioning Thompson, Investigator Bartlett noticed a Costco card in the car door compartment with the name Rajeez Shamaar, who was one of the victims of the motel robberies. (Tr. at 34-35, 62).

Officers continued to question Thompson and Nelson as to why they were there, what they had been doing, who lived at Apartment 4, who was currently upstairs in Apartment 4, and whether there were guns in the apartment. (Tr. at 35, 66, 78). Thompson replied that she "figured there [were] weapons in the apartment," namely a gun, and became "very frightful" because her eleven-month-old child was in the apartment. (Tr. at 35-36, 39, 67). Investigator Bartlett recalls that Thompson pleaded for them to get her child from the apartment. (Tr. at 85).

Investigator Bartlett determined that, "[b]ased on the series of seven robberies, their violent takeover nature," and the fact that an infant was in the apartment with the suspects, he was "fearful of a barricade situation." (Tr. at 39-40, 65-66). Investigator Bartlett expounded that the suspects had been "very adamant about pointing pistols at people as close as contact with the victims" and that he believed they were "very violent." (Tr. at 40).

Thus, Investigator Bartlett assembled a team of officers to approach the apartment. (Tr. at 36). He initially set up a covert observation point in a different location from the place where he had stopped and detained Thompson and Nelson, because that spot was in "direct view" from Apartment 4, potentially allowing the occupants to become aware—if they had not already—of the presence of law enforcement. (Tr. at 36). Officers approached Apartment 4, knocked on the door, shouted "police," and instructed the occupants to "open the door" because they were "here for the child." (Tr. at 37, 63). They received no response from the occupants. (Tr. at 37). Officers knocked louder

and continued "screaming police," at which time they heard a voice from inside the apartment say, "don't open the door." (Tr. at 37, 63, 80). Investigator Bartlett's concern grew, as he determined that the man shouting not to allow police to enter for the child was "not a very good indication." (Tr. at 80). Officers then heard "a lot of scratching noises, like furniture being moved." (Tr. at 37, 64-65).

By this time, one of the other officers had been able to obtain a key to the apartment from the complex manager. (Tr. at 37-38, 62). Investigator Bartlett attempted to use the key, but it did not fit. (Tr. at 38). Officers knocked again and continued to hear scuffling noises. (Tr. at 38). Ultimately, when the occupants did not comply with officer's commands, Investigator Bartlett kicked the door in, and officers forced entry into the apartment with guns drawn. (Tr. at 38, 81, 91).

Upon entry, officers observed two men, who would later be identified as Dunn and Kody Evans, "running away from the door." (Tr. at 38). All occupants of the apartment, who were also instructed to get onto the ground, were "patted down for guns." (Tr. at 38). Officers walked through the apartment to insure that there were no other individuals in the residence, and they searched the immediate area where they sought to detain the individuals, including the couch, for safety purposes. (Tr. at 44, 69, 95-96).

Once the apartment was secured, officers had located Dunn, Kody Evans, Kirby Evans, and two young children. Investigator Bartlett then inquired as to who was the leaseholder of the apartment, to which Kirby Evans responded that she was the leaseholder. (Tr. at 42-43, 70). Investigator Bartlett asked Sergeant Joseph Poindexter to escort Kirby Evans outside with the two children and to allow Thompson to be reunited with her child. (Tr. at 43, 91-92, 96). Investigator Bartlett further instructed Sergeant Poindexter to ask Kirby Evans whether she would consent to a

search of the apartment. (Tr. at 44, 92). Kirby Evans indicated to Sergeant Poindexter that she did consent to the search of the apartment, and she executed a written consent form. (Tr. at 44, 92-93 & Exhibit 10).

Investigator Bartlett and other officers then executed a search of the apartment. (Tr. at 44). They located an "older revolver" in the tank of a toilet and "several articles of clothing" that were depicted in the video surveillance recordings of the motel robberies. (Tr. at 44-45). Following the search, Dunn and Kody Evans were arrested. (Tr. at 47, 82). Dunn made a series of written confessions to all seven of the motel robberies. (Tr. at 48). Kody Evans declined to make any statement. (Tr. at 48).

Kirby Evans and Thompson also provided statements to officers regarding their knowledge of the events. (Tr. at 82 & Exhibits 11, 12). Kirby Evans' statement corroborated Investigator Bartlett's account of events at the apartment, including that Kody Evans "held the door"[2] and "hollered" not to open the door, that she heard someone try to use a key to open the door, and that the officers eventually forced entry. (Tr. at 105, 107, 121-22, Exhibit 12). Kirby Evans further stated that she had a silver Chevrolet Malibu with Arkansas tags. (Exhibit 12). Kirby Evans reiterated that she was the leaseholder of the apartment, that she consented to the search of the

---

[2] At the hearing, Kirby Evans testified that Kody Evans was not in the living room when the officers entered the apartment. (Tr. at 113-14). Yet, also during the hearing, Kirby Evans testified that she was in the living room near the door as the police were seeking to enter, that she "looked at" Kody Evans "to confide in him," that she was "asking him basically what's going on," and that he was advising her not to open the door. (Tr. at 105-07). Ultimately, the Court accredits her November 12, 2008 Robbery Witness Statement, which seems to be consistent with at least portions of her testimony, that Kody Evans was in the living room holding the door when the police entered. (Exh. 12). This statement was given on the date of the arrests when her recollection of the events would have been at its best and is further corroborated by Investigator Bartlett's account of events. (Tr. at 38).

apartment, and that neither she nor her children were treated badly or threatened. (Exhibit 12).

Thompson's statement recounted that she knew that Kody Evans, Dunn, and Jones had participated in certain robberies and that she was aware of various details of their schemes, including that Jones would "case the place and drive," that Kody Evans would "jump the counter and get the money," and Dunn would brandish the gun. (Exhibit 11). Thompson stated that she knew that Jones' red Chrysler Sebring was used in the robberies. (Exhibit 11). Thompson further stated that, when officers arrived at the apartment looking for Jones, she "asked them to please get [her] baby out of the apartment." (Exhibit 11).

Kirby Evans further testified at the hearing, including as to details of Kody Evans and Dunn's utilization of the apartment. (Tr. at 103). Kirby Evans testified that her sister, LaShawnese Jones, and her brother, Kody Evans, lived at the apartment with her. (Tr. at 103, 107, 113). Kirby Evans kept the sole key to the apartment. (Tr. at 113). Kirby Evans stated that Dunn was Jones' boyfriend and would "occasionally spend nights over" but did not "live there." (Tr. at 103). Kirby Evans stated that Dunn did keep personal items, including a toothbrush, at the apartment. (Tr. at 114). Kirby Evans testified that Dunn had spent at least the two previous nights at the apartment. (Tr. at 103, 115). Kirby Evans stated that everyone "chipped in to help pay bills," including Kody Evans and Dunn. (Tr. at 103, 113). Ultimately, Kirby Evans testified that she voluntarily and willingly consented to the search of the apartment because she "just didn't have anything to hide." (Tr. at 111-112).

## II. Proposed Conclusions of Law

### A. *Dunn's Motion to Suppress*

Dunn's motion seeks the suppression from evidence as follows: (1) the pistol and clothing

items that police recovered in the apartment on November 12, 2008; and, (2) confessions he gave to the police after his arrest admitting his participation in the motel robberies.

The inquiry regarding the search of the apartment must begin with a determination of whether Dunn has standing to challenge the search. Under the Fourth Amendment to the United States Constitution, standing to challenge a search depends upon whether the person has a "legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143 (1978). The Supreme Court has determined that an overnight guest at a residence has a legitimate expectation of privacy in the host's home and can claim the protection of the Fourth Amendment in that place. Minnesota v. Olson, 495 U.S. 91, 99-100 (1990). The Olson court reasoned that an individual is most vulnerable while sleeping, and as such, will seek a private place to sleep. Id. "That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy." Id. Additionally, the Supreme Court has stated that the protections of Olson apply when there has been a "previous relationship" with the host and a "degree of acceptance into the household." Minnesota v. Carter, 525 U.S. 83, 90 (1998).

Upon review, the Court recommends that the District Court conclude that Dunn has standing as an overnight guest to challenge the constitutionality of the search. According to Kirby Evans' testimony, her sister, LaShawnese Jones, was a resident of the apartment. Dunn was Jones' boyfriend, had previously stayed overnight at the apartment, contributed to the rent payments, and kept personal items such as a toothbrush at the apartment. Thus, the Court concludes that Dunn has a sufficient previous relationship to the apartment to demonstrate the requisite level of acceptance into the household for purposes of standing.

Once standing has been established, the inquiry turns to whether the search was conducted

within the confines of the Fourth Amendment. To make that determination, Court will first consider the constitutionality of the officers' entry into the apartment based upon the stated goals of preventing a barricade situation and protecting the infant child. It is well-settled that police officers may conduct a warrantless entry into a home if exigent circumstances are present. <u>Warden v. Hayden</u>, 387 U.S. 294, 298-99 (1967). The Sixth Circuit has recognized four categories that may give rise to exigent circumstances, including a risk of danger to police or others. <u>United States v. Williams</u>, 354 F.3d 497, 503 (6th Cir. 2003). The risk of danger is sufficient to excuse the warrant requirement when the officers have a reasonable belief that a suspect in the home possesses a weapon and has demonstrated a willingness to use the weapon. <u>Causey v. City of Bay City</u>, 442 F.3d 524, 529 (6th Cir. 2006) (citing <u>Dickerson v. McClellan</u>, 101 F.3d 1151, 1159-60 (6th Cir. 1996)).

With respect to satisfying the exigent-circumstances exception, it is important to note that officers do not need "ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." <u>Johnson v. City of Memphis</u>, 617 F.3d 864, 868 (6th Cir. 2010) (citations and internal quotations omitted). "Nor do officers need to wait for a potentially dangerous situation to escalate into public violence in order to intervene." <u>Id.</u> "The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." <u>Id.</u> Thus, so long as the police's entry is based upon an objectively reasonable belief, given the information available at the time, that a necessary exigency exists, the Court will permit the warrantless entry under this exception. <u>Id.</u>

Upon review, the Court must first consider whether the officers had a reasonable belief that the occupants of the apartment possessed a weapon. Officers interviewed Thompson upon arriving

at the scene and appropriately inquired as to whether any of the occupants had weapons. Thompson, an acquaintance of the occupants, informed officers that she believed they possessed a firearm. She further identified the occupants of the apartment, two of whom—Jones and Dunn—were the individuals positively identified by Straughter as the robbery suspects. Further, Dunn was the individual that Straughter identified as having wielded the firearm. Thus, officers had a reasonable belief that the suspects inside the apartment possessed a weapon.

With respect to willingness to use a weapon, the occupants had also demonstrated this by their previous use of a firearm in the string of multiple armed robberies. In fact, not only had the assailants displayed the firearm, but they had resorted to extremely dangerous measures, including placing the firearm into contact with individuals that they robbed to accomplish the offenses. Accordingly, the Court concludes that it was reasonable for the officers to conclude that the suspects were willing to use the firearm.

These concerns were further heightened by the circumstances on the scene that exacerbated the already present exigencies. The location of the detention of another suspect, Nelson, and their acquaintance, Thompson, was directly visible from the apartment. Thus, officers had reason for concern that the occupants either were already aware or would become aware of their presence.[3]

---

[3] Officers detained these two individuals at that location because it was where they happened upon them preparing to leave the premises in a vehicle that matched the description of one used in the robberies. Further, once officers spoke to Nelson and Thompson, they moved their position to a location not visible from Apartment 4. Thus, there is no reason to believe that the officers improperly acted to create the exigent circumstances; on the contrary, they responded to the unanticipated exigency of happening upon two vehicles matching the descriptions of those used in the robberies and one person matching the perpetrator's description. United States v. Chambers, 395 F.3d 563, 566 (6th Cir. 2005); Ewolski v. City of Brunswick, 287 F.3d 492, 504 (6th Cir. 2002); United States v. Campbell, 261 F.3d 628, 633 (6th Cir. 2001).

Officers were further informed that an infant child was with the armed suspects in the apartment, and the mother, who was a close acquaintance of the occupants, was agitated and concerned about the child's safety. Once the officers went to the apartment and knocked and announced their presence, the occupants did not comply with officers' instructions and shouted not to open the door. Officers heard sounds they believed sounded like furniture moving, which heightened their fear of a potential barricade situation. Most concerning, even though the officers announced that they were "here for the child," the occupants would not comply. Accordingly, the Court finds that it was reasonable for the officers to conclude that the risk of danger in a potential barricade situation to the child and to law enforcement officers justified the warrantless entry of the apartment. Thus, the Court recommends that the entry into the apartment was lawful.

Next, the Court must analyze the constitutionality of the search that officers subsequently conducted. It is uncontradicted in the record that officers did not search the residence, other than for individuals in the apartment, until they had obtained consent of the leaseholder, Kirby Evans. It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). The government bears the burden to establish that consent to search was "freely and voluntarily given." Id. at 222 (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). In this case, Kirby Evans stated that she was the leaseholder of the apartment and voluntarily gave consent because she did not have anything to hide.

Despite the leaseholder's voluntary consent, Dunn argues that his consent was also required for officers to search the apartment. The Court finds this argument to be misplaced. So long as the consenting individual has actual common authority over the room, United States v. Matlock, 415

U.S. 164, 170-71 (1974), or apparent common authority over the room, <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 182-87 (1990), officers may rely on the consent of one occupant. The rationale is that it is "reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." <u>Matlock</u>, 415 U.S. at 171 n.7.

In this case, the record reflects that Kirby Evans was the sole leaseholder at the apartment. Kirby Evans also maintained the only key to the apartment. Dunn, on the other hand, did not reside at the apartment, but only "occasionally" stayed overnight. Dunn elected to stay as an overnight guest knowing that he did not have full control over the premises, and, as such, Dunn assumed the risk that the leaseholder and sole key holder might allow the apartment to be searched.

Ultimately, the Court recommends that the District Court conclude that the search of the apartment was constitutionally permissible based upon the consent of the leaseholder, Kirby Evans, and that the evidence of the revolver and items of clothing should not be suppressed. Further, Defendant's only challenge regarding his confession is that it was "obtained by exploitation of an illegal arrest." <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590, 603 (1975).[4] As the Court has recommended a finding that Evans' arrest was lawful, the Court likewise recommends that Defendant's confession should not be suppressed.

### B. Evans' Motion to Suppress

Evans' motion seeks the suppression of evidence as follows: (1) the pistol and clothing found in the apartment where he was arrested; and (2) post-arrest eyewitness identifications of him made

---

[4] Dunn did not raise any other issues regarding the constitutionality of his confession, including that it was not knowingly and voluntarily given in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). (Tr. at 8-9).

by a number of robbery victims.

With respect to the search of the apartment, during which officers obtained the revolver and certain items of clothing, the Court has already addressed the constitutionality with respect to Dunn's Motion to Suppress. (See, supra, Section A). Although it does not appear to be contested, the Court finds that Evans has standing to challenge the constitutionality of the search as a resident of the apartment. However, ultimately, the Court does not find any unique arguments that would alter the analysis of the constitutionality of the search as to Evans. Accordingly, the Court recommends that the search of the apartment was constitutionally permissible based upon the consent of the leaseholder and that the evidence of the revolver and items of clothing should not be suppressed.

Next, Evans raises the issue that the post-arrest eyewitness identifications of him made by a number of robbery victims are unconstitutional. Specifically, Evans argues that his arrest was unlawful because it was not supported by probable cause, and, as such, the use of his photograph in eyewitness identifications is derivative of the illegality and would constitute fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 485 (1963).

Beginning with the question of the legality of Evans' arrest, the United States submits that officers had ample evidence to arrest him at the apartment, even though he had not yet been positively identified in the Crime Stoppers tips or by any of the robbery victims. Specifically, the United States argues as follows: (1) that Evans matched the general description of one of the robbers; (2) that officers were aware through investigating electronic databases that Evans had connections with Dunn, Jones, and Nelson, who were also found at the apartment; (3) that officers arrested Evans in the apartment with Dunn and Jones, who had already been positively identified

by an eyewitness as two of the hotel robbers; (4) that Evans held the door to the apartment attempting to prevent their entry and then ran away from the door in an attempt to flee when officers entered the apartment; (5) that a revolver and clothing matching those used in the hotel robberies were found in the apartment with Evans and the two other positively identified robbers, Dunn and Jones; (6) that the red Chrysler Sebring and silver Chevrolet Malibu matching the suspected vehicle descriptions were parked outside of the apartment; and, (7) that the Costco card of victim Rajeez Shamaar was observed in one of the vehicles.

Despite the United States's assertions, Evans argues that the officers did not have probable cause because he had not been named in any of the Crime Stopper tips or positively identified by any of the victims before his arrest. Ultimately, Evans claims that officers arrested him based only upon a generic suspect description and nothing more.[5]

Probable cause for an arrest exists when a person of reasonable caution would be justified in believing that the individual to be arrested has committed, is committing, or is about to commit a crime. Beck v. Ohio, 379 U.S. 89, 91 (1964). Probable cause is determined by the totality of the circumstances "from a law enforcement officer's perspective." United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993).

In the instant case, officers located Evans with Dunn, Jones, and Nelson, who had already been identified as suspected perpetrators of the robberies. While "a person's mere propinquity to others independently suspected of criminal activity does not give rise to probable cause," it is a

---

[5] Evans further states that "the officers did not know anything about Kody Evans" before their arrival at the apartment. However, this is contradicted by the record. Investigator Bartlett had already found known connections between Dunn, Jones, and Evans before visiting the 4250 Summer address (Tr. at 26, 76-79), where they were confronted with substantial evidence regarding the robberies.

relevant factor to be considered.  <u>Ybarra v. Illinois</u>, 444 U.S. 85, 91 (1979).  Next, officers were already aware that Evans had some type of connection to Dunn and Jones based upon their investigation.  Evans was not only found at the same place as Dunn, Jones, and Nelson, but also at the same location as both suspected getaway cars, one of which contained the Costco card of victim Rajeez Shamaar, as well as at the same location where clothing and a revolver matching the description of those used in the robberies was retrieved.  Additionally, Evans matched the general description of the fourth suspect.  While Investigator Bartlett noted that these descriptions were fairly "generic," it nonetheless adds to the balance of the totality of the circumstances.

Based upon these facts alone, the officers had at the very least developed reasonable suspicion as to Evans' involvement in criminal activity.[6]  <u>See</u> <u>Terry v. Ohio</u> 392 U.S. 1, 21-22 (1968) (requiring officers to have "specific and articulable facts" before an investigatory detention); <u>United States v. Craig</u>, 198 Fed. Appx. 459, 462-63 (6th Cir. 2006) (concluding that matching general description of robbery suspect is factor for reasonable suspicion).  However, in addition to the facts already discussed, Evans was found attempting to hold the door to prevent police entry and then attempting to run from police when they entered the apartment.  The Supreme Court has recognized that flight from police presence is the "consummate act of evasion" and that, while it is

---

[6]  The officers arguably had already established probable cause at this point.  <u>See</u>, <u>e.g.</u>, <u>United States v. Carpenter</u>, 342 F.3d 812 (7th Cir. 2003) (concluding that officers had probable cause when the individual matched the description of the suspect and was seen with two other suspects six hours after robbery and again two days later); <u>United States v. Cox</u>, 464 F.2d 937 (6th Cir. 1972) (concluding that officers had probable cause when they observed the car used in the robberies with suspects matching the general description near the car and then found evidence of the robberies); <u>United States ex rel. Hollman v. Rundle</u>, 461 F.2d 758 (6th Cir. 1972) (concluding that officers had probable cause when the individual fit the description of the suspect, was seen one night later near the scene of the crime, and was with a man who fit the description of the other suspect).

"not necessarily indicative of wrongdoing, . . . it is certainly suggestive of such." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000). The Sixth Circuit has concluded that a suspect's "efforts to flee, coupled with . . . reasonable suspicion" establishes probable cause. <u>United States v. Dotson</u>, 49 F.3d 227, 231 (6th Cir. 1995).

Based upon the articulable facts providing reasonable suspicion of Evans' criminal involvement, his attempt to prevent the officers' entry, and his decision to run from the officers, the Court recommends that the District Court conclude that Evans' arrest was properly supported by probable cause. Further, the Court recommends that, as Evans' arrest was lawful, the post-arrest identification of Evans raises no constitutional concerns.

### III. Conclusion

For the foregoing reasons, the Court RECOMMENDS that Dunn's Motion to Suppress and Evans' Motion to Suppress be DENIED.

**DATED** this 27th day of March, 2012.

<u>s/ Charmiane G. Claxton</u>
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**